UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | CR. NO. 1:23-CR- 110 |
| | : | |
| v. | : | |
| | : | (Judge Kane     ) |
| **FLORENTINA MAYKO**, | : | |
| | : | |
| Defendant. | : | (Filed Electronically) |

# I N F O R M A T I O N

THE UNITED STATES ATTORNEY CHARGES:

At times material to this Information:

## COUNT 1
18 U.S.C. § 1349
(Conspiracy to Commit Health Care Fraud)

## BACKGROUND

1. The defendant, FLORENTINA MAYKO, was a resident of the Western District of Pennsylvania.

2. Pain Medicine of York ("PMY") was a medical practice located in York, PA, in the Middle District of Pennsylvania. It was founded in or around 2000. PMY OWNER acquired PMY with an effective date in or around 2014.

3. PMY was a medical practice specializing in pain management. Under PMY OWNER's ownership, PMY also did business under the name All Better Wellness. PMY and All Better Wellness were providers enrolled with Medicare.

4. From about 2017 through 2019, a large percentage of PMY's patients received prescriptions for opioid medications at each visit. In order to receive refills of their prescription opioid medications, patients had to be seen in person by a medical provider each month.

5. PRACTICE GROUP 1 was a group of medical practices with locations in Altoona, Johnstown, State College, and other addresses in Pennsylvania and Maryland. Like PMY, PRACTICE GROUP 1 specialized in pain management and prescribed a large percentage of its patients opioid medications at each monthly visit.

6. PHYSICIAN 1 was a physician with specialized training in anesthesiology. PHYSICIAN 1 owned and operated PRACTICE GROUP 1 until about the middle of 2017. In or about July 2017, PHYSICIAN 1 was sentenced by a U.S. District Court to a multiyear term of imprisonment for conspiracy to commit health care fraud and a federal tax offense. PHYSICIAN 1 had pleaded guilty to participating in a

2

fraud scheme in which PHYSICIAN 1 received kickbacks in return for referring patients for drug testing and related laboratory work. PHYSICIAN 1 was also sentenced in a second U.S. District Court to a concurrent multiyear term of imprisonment for receiving illegal kickbacks for medically unnecessary prescriptions for compounded pain cream medications. PHYSICIAN 1 was ordered to pay more than $3 million in restitution to different agencies of the federal government for these offenses.

7. PMY OWNER and PHYSICIAN 1 were friends and business associates. Around early 2017, PMY OWNER knew of PHYSICIAN 1's likely imprisonment and the reasons for it. All of PRACTICE GROUP 1's operations were transitioned to PMY in 2017 as PHYSICIAN 1 was preparing to be sentenced to prison. From this time forward, PMY encompassed both its original location in York, PA, as well as then remaining locations of PRACTICE GROUP 1 in Altoona, Johnstown, State College, and elsewhere.

8. PMY OWNER exercised control over PMY either as the direct owner or, from June 2018 onward, through a management company that he controlled.

3

9. FLORENTINA MAYKO became the CEO of Pain Medicine of York in or about January 2018. Prior to that, FLORENTINA MAYKO served as Director of Operations of PRACTICE GROUP 1, where she was hired to work by PHYSICIAN 1. FLORENTINA MAYKO first assumed a leadership role at PMY when PRACTICE GROUP 1's operations were transitioned to PMY in 2017. FLORENTINA MAYKO had no medical training and no experience operating or managing medical practices prior to being appointed Director of Operations of PRACTICE GROUP 1. When FLORENTINA MAYKO was promoted to the position of CEO of PMY, FLORENTINA MAYKO's day-to-day responsibilities did not materially change.

10. From the time of FLORENTINA MAYKO's promotion to CEO until the time that PMY ceased operations at the end of 2019, PMY OWNER traveled regularly to other states for lengthy periods of time, leaving FLORENTINA MAYKO in charge of the day-to-day management of PMY's operations.

11. On or about November 6, 2019, members of federal and Commonwealth of Pennsylvania law enforcement executed search warrants at PMY's various locations. Following this operation, PMY

4

became unable to retain medical providers and therefore could no longer see patients. It ceased operations in or about December 2019.

*Medicare and Urine Drug Testing*

12. A "health care benefit program" is defined as "any public or private plan to contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." Title 18, United States Code, Section 24(b). In this case, the Medicare Program falls under the definition of a "health care benefit program."

13. The Medicare Program ("Medicare") is a federally funded health care program generally providing benefits to people aged 65 or older, younger people with disabilities, and people with end stage renal disease. Medicare is administered by the Centers for Medicare & Medicaid Services (CMS), a federal agency within the Department of Health and Human Services (HHS). Individuals who receive Medicare benefits are referred to as Medicare "beneficiaries."

14. Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug

benefits (Part D). Medicare Part B helps to pay the cost of medically necessary physician office services, medical equipment and supplies, and other health services and supplies not paid by Part A.

15. Medicare also covers clinical laboratory services, including urine drug testing (UDT), under Part B. Physicians use UDT to detect the presence or absence of drugs or to identify specific drugs in urine samples. Drug testing is the process of using a biological sample— usually urine or blood—to detect the presence or absence of a drug or its metabolites in the body. Generally, there are two types of drug testing services: (1) presumptive testing and (2) definitive testing. Presumptive drug testing provides a negative, positive, or numerical result indicating the presence or absence of drugs or drug classes. Definitive drug testing identifies specific medications, illicit substances, and metabolites and reports the results in concentrations of specific drugs within a drug class.

16. Medicare requires that drug testing services be ordered and testing results be used by the physician or qualified nonphysician practitioner who is treating the beneficiary. Clinical laboratories may provide drug testing services and submit Medicare Part B claims to one

of the seven Medicare Administrative Contractors (MACs), based on jurisdiction, for those services. Medicare Administrative Contractors (MACs) process Medicare claims and develop Local Coverage Determinations (LCDs). An LCD is a coverage decision for a service or item within a MAC's jurisdiction and made in accordance with section 1862(a)(1)(A) of the Social Security Act.

17. Novitas Solutions, Inc. (Novitas) is the MAC that administers the Medicare Part B program for claims arising in the Commonwealth of Pennsylvania. CMS contracts with Novitas to receive, adjudicate, process, and pay certain Part B claims.

18. For presumptive drug testing services, laboratories use one of three CPT11 codes (80305, 80306, and 80307), depending on the level of complexity of the test. For definitive drug testing services, laboratories use one of five Healthcare Common Procedure Coding System (HCPCS) codes (G0480, G0481, G0482, G0483, and G0659), which generally are dependent on the number of drug classes, including metabolites, that are tested.

19. CMS requires individuals and entities, including clinics/group practices, that wish to provide medical services to individuals enrolled

7

in Medicare to complete the CMS-855. By becoming a participating provider in Medicare, enrolled providers agree to abide by the policies and procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, are required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors. Health care providers are given and provided with online access to Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations.

20. Health care providers may only submit claims to Medicare for medically reasonable and medically necessary services and supplies. Medicare defines "medically necessary" as health care services or supplies needed to diagnose or treat an illness, injury, condition, disease, or its symptoms and that meet accepted standards of medicine. Services must meet specific medical necessity requirements in the statute, regulations, manuals, and specific medical necessity criteria

defined by National Coverage Determinations (NCDs) and LCDs, if any apply to the reported service.

21. Under Novitas LCD L35006 ("Controlled Substance Monitoring and Drugs of Abuse Testing"), "[t]reatment for patients on chronic opioid therapy (COT)" is considered one of the "Covered Indications," or permissible purposes, for the use of urine drug testing. UDT may also be used as part of treatment for opioid use disorder, including for patients receiving SUBOXONE®. SUBOXONE® is a prescription medicine combining buprenorphine and naloxone used to treat adults who are addicted to or dependent on opioid drugs, whether prescription or illegal. Buprenorphine works partially like an opioid, but the effect is weaker than opioids such as heroin and methadone. It also has a "ceiling effect," which reduces the risk of misuse, dependency, and side effects. Buprenorphine lowers the effects of opioid withdrawal symptoms and cravings, which helps people who take the medication abstain from other opioids. Naloxone is a medicine that rapidly reverses an opioid overdose.

22. When dealing with patients on chronic opioid therapy, LCD L35006 states, "[a] physician who is writing prescriptions for

medications to treat chronic pain can manage a patient better if the physician knows whether the patient is consuming another medication or substance, which could suggest the possibility of [substance use disorder] or lead to drug-drug interactions. Additionally, UDT may help the physician monitor for medication adherence, efficacy, side effects, and patient safety in general." In other words, drug testing on patients who regularly take opioid prescription medications can help to determine whether those patients are taking their medications appropriately, diverting their medications to other users, taking street drugs in addition to their prescription opioid medications, or are at risk of potentially dangerous drug interactions, among other things.

23. LCD L35006 also says that both presumptive and definitive UDT orders "should be individualized based on clinical history and risk assessment, and must be documented in the medical record." The medical necessity guidance says that "[c]riteria to establish medical necessity for drug testing must be based on patient-specific elements identified during the clinical assessment, and documented by the clinician in the patient's medical record and minimally include the following elements: Patient history, physical examination and previous

laboratory findings; Current treatment plan; Prescribed medication(s); and Risk assessment plan."

24. LCD L35006 also specifies that a "blanket order" is a "[t]est request that is not for a specific patient; rather, it is an identical order for all patients in a clinician's practice without individualized decision making at every visit." Blanket orders are listed in this LCD under "Non-Covered Services." A non-covered service in medical billing means one that is not covered by government and private payers, and under Medicare that includes medically unreasonable and unnecessary services and supplies.

25. The LCD defines "Reflex Testing" as "Laboratory testing that is performed reflexively after initial test results to identify further diagnostic information essential to patient care." The LCD's section on Non-Covered Services states: "Reflex definitive UDT is not reasonable and necessary when presumptive testing is performed at point of care because the clinician may have sufficient information to manage the patient. If the clinician is not satisfied, he/she must determine the clinical appropriateness of and order specific subsequent definitive testing (e.g., the patient admits to using a particular drug, or the IA

11

cut-off is set at such a point that is sufficiently low that the physician is satisfied with the presumptive test result)."

26. The section on Non-Covered Services also states, "Routine standing orders for all patients in a physician's practice are not reasonable and necessary." A standing order is defined as a "[t]est request for a specific patient representing repetitive testing to monitor a condition or disease for a limited number of sequential visits."

## STATUTORY ALLEGATION

27. Paragraphs 1 through 26 are incorporated here.

28. From in or around July 2017 until in or about December 2019, in York County, within the Middle District of Pennsylvania, and elsewhere, the defendant,

### FLORENTINA MAYKO

did knowingly conspire and agree, together and with other persons both known and unknown to the United States, to commit offenses against the United States and to defraud the United States, that is:

To knowingly and willfully execute and attempt to execute a scheme and artifice to defraud Medicare, a health care benefit program as

defined in Title 18, United States Code, Section 24(b), in connection with the payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347,

MANNER AND MEANS OF THE CONSPIRACY

29. PHYSICIAN 1 told PMY OWNER in or around 2016 that every patient of PMY would receive two urine drug tests—both a presumptive test and a definitive test—at every office monthly visit. PHYSICIAN 1 told PMY OWNER that this practice would be necessary to make the business sufficiently profitable. PMY OWNER agreed to implement this practice.

30. PMY operated a drug testing laboratory that was collocated with its Altoona office location and was previously part of PRACTICE GROUP 1. PMY's practice was to send its patients' urine samples to its own testing lab for UDT, rather than to private clinical laboratory companies, whenever possible. As a result, PMY regularly received Medicare Part B payments for its patients' office visits and for their UDTs. From around mid-2017 to the end of 2019, PMY submitted claims for payment to Medicare totaling over $10 million just for UDTs.

31. From about 2016 to 2019, PMY had a relationship with a company ("BILLING COMPANY") that was responsible for submitting bills to medical insurance companies, including Medicare, on its behalf. BILLING COMPANY kept data showing the number of UDTs that were submitted for payment broken down by procedure code.

32. As CEO of PMY, FLORENTINA MAYKO regularly requested and received updates from BILLING COMPANY on the number of UDTs ordered each month and the insurance billing associated with those UDTs.

33. From early 2017 to mid-2017, the number of UDTs—both presumptive and definitive—for which PMY sought payment from Medicare grew substantially. In March 2017, there were approximately 500 UDTs submitted for payment under procedure code 80307, the highest-level and most expensive presumptive UDT; approximately 300 UDTs were submitted for payment under procedure code G0483, the highest-level and most expensive definitive UDT, which is comprised of a panel of tests for 22 or more classes of drugs. In August 2017, there were approximately 2,250 UDTs submitted for payment under

procedure code 80307, and approximately 2,560 UDTs submitted for reimbursement under procedure code G0483.

34. Until about April 2019, G0483 was the only procedure code that PMY ever used for definitive tests. Over the course of PMY's relationship with BILLING COMPANY, procedure code G0483 was used for approximately 92% of all definitive UDTs submitted to insurance companies, and procedure code 80307 was used for approximately 99.8% of all presumptive UDTs submitted to insurance companies.

35. Each test under procedure code 80307 was billed to Medicare for approximately $160 and, when covered, was paid at a rate of over $70. Each test under procedure code G0483 was billed to Medicare for approximately $500 and, when covered, was paid at a rate of over $240. From around mid-2017 through the end of 2019, PMY received Medicare payments for UDTs totaling over $4 million, a large portion of which went to PMY OWNER and FLORENTINA MAYKO. FLORENTINA MAYKO used significant proceeds from UDTs to purchase investment properties.

15

36. PMY implemented a standard UDT billing practice by using a form included in each patient file at every office visit. The medical providers seeing patients received a form stating, "All Better Wellness Center Altoona Clinic QUALITATIVE TESTING WITH REFLEXIVE CONFIRMATION REQUISITION." The provider's name was also typed in as the "REQUESTING PHYSICIAN." In the section for "Test orders," there were two options: the first was "USE Custom Profile (1) Drugs of Abuse Screen with Reflexive Confirmation"; the second option was "Alternative Custom Profile." The box for the first option was pre-checked—meaning medical providers exercised no discretion, and therefore for each patient a "screen" (i.e., presumptive test) and a "reflexive confirmation" (i.e., confirmatory test) were ordered at each and every visit.

37. FLORENTINA MAYKO was aware of this UDT order form, was responsible for making edits to the form, and ensured that medical providers at PMY used the form at each visit.

38. PMY OWNER and FLORENTINA MAYKO also took over management of other medical practices, including a practice in New

Cumberland, Pennsylvania, where S.M, a family medicine specialist, worked.

39. PMY OWNER and FLORENTINA MAYKO were repeatedly confronted with information regarding the unlawful nature of the company's UDT billing practices. For instance, in an email on or about July 29, 2017, S.M. sent PMY OWNER an email in which he complained about the pressure from FLORENTINA MAYKO to see more patients and bill patients for more lab services, including UDT. S.M. expressed concerns about "ordering urine drug screens every visit on all Suboxone patients just to generate income" because these were "unnecessary tests" and "outside the standard of care." S.M. also raised the risk of "potentially having to pay back moneys for tests declared unnecessary by an outside physician reviewer."

40. Approximately one month later, on or about August 28, 2017, FLORENTINA MAYKO wrote to S.M.'s administrative assistant asking, "Did you send urines to us for these pts [i.e., patients]?" The assistant copied S.M. on the email and wrote back to FLORENTINA MAYKO, "Urines were performed on these patients last month. . . . Federal guidelines call for performing urine drug screens every 3 or 4

months and even just once or twice a year on stable patients." S.M.'s assistant raised concerns about "unnecessary testing" with FLORENTINA MAYKO in the same email.

41. In August 2017, the number of definitive UDTs that PMY billed under procedure code G0483 increased more than 50% from just the previous month.

42. Around the end of 2018, PMY OWNER and FLORENTINA MAYKO entered into a joint venture to acquire management control of PRACTICE GROUP 2. FLORENTINA MAYKO identified this opportunity and brought it to PMY OWNER for his financial backing. PMY OWNER and FLORENTINA MAYKO agreed with the physicians who owned PRACTICE GROUP 2 that it would send urine samples to PMY's lab for testing. In connection with this joint venture, which generated additional UDT billing, FLORENTINA MAYKO negotiated a profit-sharing agreement with PMY OWNER.

43. Starting around the end of 2018 and continuing until the time that search warrants were executed at PMY's various locations on or about November 6, 2019, FLORENTINA MAYKO continued to enforce PMY's policy of billing for multiple urine tests at each patient visit

18

despite increasingly frequent warning signs about their lack of medical necessity.

44. For example, on or about February 27, 2019, a representative of BILLING COMPANY sent FLORENTINA MAYKO an email summarizing a recent letter from one insurance company, stating that the insurance company was "trying to monitor UDT testing for necessity" and had accordingly instituted a "pre-payment audit." On or about March 2, 2019, FLORENTINA MAYKO wrote to the BILLING COMPANY representative expressing concerns about falling income despite "increasing business."

45. On or about July 31, 2019, the BILLING COMPANY representative wrote to FLORENTINA MAYKO that the same issue previously raised by the insurance company in the prior email was now being raised by another company. The representative stated, "A processes [*sic*] for someone to review the screens need to be set in place at PMY to determine if a confirmation is necessary." In response to warning signs of this kind, PMY began to down-code some of its confirmatory tests to a lower billing code such as G0482, but it did not

alter its practice of requiring both presumptive screens and reflexive confirmations at every patient visit.

46. In or around mid-2019, BILLING COMPANY held an in-person meeting with PMY OWNER and FLORENTINA MAYKO. At this meeting, a representative of BILLING COMPANY asked PMY OWNER and FLORENTINA MAYKO what PMY intended to do about its UDT practices in response to multiple insurance companies raising questions about the medical necessity of PMY's UDTs. With FLORENTINA MAYKO present, PMY OWNER responded that changing PMY's practice of ordering multiple UDTs for each patient at every office visit would put the company out of business. Following this meeting, PMY continued to bill for multiple UDTs for each patient at every office visit.

47. After this meeting, PMY OWNER and FLORENTINA MAYKO continued to explore opportunities to sell PMY to an acquiring company. These efforts ceased around the time that search warrants were executed at PMY's various locations on or about November 6, 2019.

48. On or about November 12, 2019, a PMY employee, acting under the direction of FLORENTINA MAYKO, sent an email to staff

containing a new UDT order form and informing medical providers that they would have to manually select which tests to conduct because the form was "no longer pre-populated." PMY could not remain in business, however, due a lack of medical providers willing to work there.

All in violation of Title 18, United States Code, Section 1349.

**THE UNITED STATES ATTORNEY FURTHER CHARGES:**

<u>FORFEITURE ALLEGATION</u>

The allegations contained in Count 1 of this Information are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982.

Pursuant to Title 18, United States Code, Section 982, upon conviction of the offense in Count One of this Information, the defendant,

## FLORENTINA MAYKO,

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982, any property, real or personal, involved in such offense, or any property traceable to such property, including but not limited to:

a.   A condominium located at 204 33rd St, #40502, Ocean City, Maryland 21842 more fully described as:

"All that property lying and being situate in the Town of Ocean City, in the Tenth Tax District of Worcester County, Maryland, and being more particularly designated and distinguished as Condominium Unit No. 405, Phase Two in "Jamaica Bay Condominium", as shown on the Condominium Plats and recorded among the Land Records of Worcester County, Maryland in Plat Book W.C.L, No. 113, folio 17, et. seq., as amended to date; together with an undivided percentage interest in the common elements and in the common expenses and common profits of the condominium as more particularly referred to and specified with respect to the unit in the Master Deed or Declaration and as shown on the Condominium Plats as [t]herein described. Being one of the condominium units mentioned in the Condominium Declaration of Master Deed (including By-Laws) of the condominium, dated July 21, 1987, and recorded among the Land Records of Worcester County, Maryland, in Liber W.C.L. No. 1341, folio 549, et. seq., as amended to date,

and as shown on the condominium plats aforesaid . . . Being the same property conveyed to F.C., by virtue of Deed from M.J.B. and M.B., dated January 16, 2004, recorded January 20, 2004, among the Land Records of Worcester County, Maryland, in Liber 3996, folio 108.

To Have and To Hold the said condominium unit above-described and mentioned, and hereby intended to be conveyed, together with the rights, privileges, appurtenances and advantages thereto belonging or appertaining unto and to the proper use and benefit of the said Aaron Mayko and FLORENTINA MAYKO, as tenants by the entirety, their ensigns, the survivor of them, and the survivor's personal representatives, heirs and assigns in FEE SIMPLE.";

b.   A condominium located at 2001 S Ocean Blvd, #903, Myrtle Beach, SC 29577 more fully described as:

"DWELLING No. 903 of Bluewater Villas, Phase III, a Horizontal Property Regime established by Master Deed dated May 26, 1983, and recorded in Deed Book 800 at Page 326, records of Horry County, South Carolina. Subject to all of the provisions of the aforesaid Master Deed and Exhibits and Amendments thereto. TOGETHER with all of the appurtenances thereto according to said Master Deed, and Exhibits and Amendments thereto, and the Grantees assume and agree to observe and perform their obligations under said Master Deed, Exhibits and Amendments thereto, including, but not limited to, payment of assessments for the maintenance and operation of the dwelling and condominium. AND SUBJECT to the

23

provisions of the By-Laws of Bluewater Villas Homeowners Association, Inc., and to all other reservations and restrictions of record, easements, zoning ordinances, and rights of way record, including those set out on the recorded map.

… This being the identical property conveyed to W.E.G. and D.L.G. by Deed of K.O. a/k/a K.O. and M.O., dated April 5, 2017 and recorded April 5, 2017 in Deed Book 3999 at Page 3066, in the Office of the Register of deeds for Horry County, South Carolina.";

and

c.    A condominium located at 1501 S Ocean Blvd, #844,

Myrtle Beach, SC 29577 more fully described as:

"…Unit 844 of Landmark Horizontal Property Regime established by Master Deed dated April 2, 2004 and recorded April 2, 2004 in Deed Book 2717 at Page 529 and amended by First Amendment to Master Deed dated June 27, 2005 and recorded June 30, 2005 in Deed Book 2935 at Page 849, and all Exhibits and Amendments thereto (herein collectively the "Master Deed"), records of Horry County, South Carolina.

SUBJECT to all of the provisions of the aforesaid Master Deed and all Exhibits and Amendments thereto.

AND SUBJECT to all other restrictions, reservations, easements and right of way, including those as may be set out on the recorded map.

TOGETHER with all of the appurtenances thereto according to said Master Deed, Exhibits and Amendments thereto, and the Grantee assumes and agrees to observe and perform its obligations under the Master Deed, Exhibits and Amendments thereto, including but not limited to the payment of the assessments for the maintenance and operation of the dwelling and condominium. AND SUBJECT to the provisions and By-Laws of Landmark Homeowner's Association, Inc.

… This being the identical property conveyed to L.I.S. and I.C.S. from J.E.S. and S.J.S. by Deed dated February 14, 2018 and recorded February 16, 2018 in Deed Book 4083, at Page 1912, Office of the Register of Deeds of Horry County South Carolina. …

TO HAVE AND TO HOLD all and singular the premises before mentioned unto the said and FLORENTINA MAYKO and Aaron Matthew Mayko, as joint tenants with right of survivorship and not as tenants in common, their heirs and assigns, forever, in fee simple."

If any of the property described above, as a result of any act or omission of the defendant:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a

third party;

25

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot

be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute

property pursuant to Title 21, United States Code, Section 853(p).

All pursuant to 18 U.S.C. § 982.


GERARD M. KARAM
United States Attorney


RAVI ROMEL SHARMA                              May 9, 2023
Assistant United States Attorney               Date

26